## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2022 KA 0575

STATE OF LOUISIANA

VERSUS

ROBERT JAVONTIE MARKS

Judgment Rendered: **MAY 1 7 2023**

\* \* \* \* \* \* \*

On Appeal from the 18th Judicial District Court
In and for the Parish of Iberville
State of Louisiana
Trial Court No. 1054-20 and 1054-20A

Honorable Alvin Batiste, Judge Presiding

\* \* \* \* \* \* \*

Antonio M. Clayton
District Attorney
Ali Meronek
Terri Russo Lacy
Assistant District Attorneys
Port Allen, Louisiana

Attorney for Appellee,
State of Louisiana

William P. Gibbens
Gwyneth O'Neill
New Orleans, Louisiana

Attorneys for Defendant/Appellant,
Robert Javontie Marks

\* \* \* \* \* \* \*

**BEFORE: WELCH, PENZATO, AND LANIER, JJ.**

Welch, J. concurs in result without reasons

**PENZATO, J.**

The defendant, Robert Javontie Marks, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1 (count 1); second degree kidnapping, a violation of La. R.S. 14:44.1 (count 2); first degree feticide, a violation of La. R.S. 14:32.6 (count 3); illegal carrying of a weapon while committing a crime of violence, a violation of La. R.S. 14:95(E) (counts 4-7); obstruction of justice by tampering with evidence, a violation of La. R.S. 14:130.1(A)(1)(a) (count 8); aggravated kidnapping of a child, a violation of La. R.S. 14:44.2 (count 9); and carjacking, a violation of La. R.S. 14:64.2 (count 10).[1] The defendant pled not guilty to all charges and, following a jury trial, was found guilty as charged on all counts. The defendant filed a motion for new trial, which was denied.

For the second degree murder conviction, the defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence; for the second degree kidnapping conviction, he was sentenced to forty years imprisonment at hard labor with the first two years of the sentence to be served without benefit of parole, probation, or suspension of sentence; for the first degree feticide conviction, he was sentenced to fifteen years imprisonment at hard labor; for each of the illegal carrying of a weapon while committing a crime of violence convictions, the defendant was sentenced to ten years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence; for the obstruction of justice by tampering with evidence conviction, the defendant was sentenced to forty years imprisonment at hard labor; for the aggravated kidnapping of a child conviction, the defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence; for the carjacking conviction, the defendant was sentenced to twenty years imprisonment at hard labor without

---

[1] The carjacking charge was subsequently added by a bill of information.

2

benefit of parole, probation, or suspension of sentence. All of the sentences were ordered to run concurrently.

The defendant now appeals, designating eleven assignments of error. We affirm the convictions. Finding error in connection with the sentence imposed for count 9, aggravated kidnapping of a child, we vacate that sentence and remand for resentencing on count 9. We affirm all other sentences.

## FACTS

Lyntell Washington was a teacher at Brookstown Middle Magnet Academy in Baton Rouge, Louisiana. She had a daughter, D.W.,[2] who was three years old in June, 2016. At that time, Ms. Washington was seven months pregnant. The defendant, who was married, was the father of her unborn baby. He was an assistant principal at Brookstown Middle Magnet Academy.

On the morning of June 9, 2016, Leslie Parms, III, was leaving the parking lot of his office on Newcastle Avenue (off South Sherwood Forest Boulevard) in Baton Rouge, Louisiana, and saw 3-year-old D.W. standing near the parking lot entrance holding a pillow. The location of the parking lot was across the street from an apartment complex. Mr. Parms testified that he did not see any adults nearby, and asked D.W. where her mother was. When D.W. did not respond, Mr. Parms called 911. Mr. Parms continued talking to D.W. while he was on the phone with the 911 operator, who indicated she would stay on the phone with Mr. Parms until the police arrived. Mr. Parms noted that D.W. had dried blood on her foot. He asked D.W. where her mother's car was, and D.W. led him to a blue Toyota Corolla. When Mr. Parms looked inside the car, he saw blood on the front seat of the car and a "sizable amount of blood" all over the back seat. D.W. told Mr. Parms that "Mr. Robbie did

---

[2] In accordance with La. R.S. 46:1844(W), the victim, who is a minor, will be referred to by her initials to protect her identity.

that blood." When Mr. Parms again asked D.W. where her mother was, D.W. said, "My mommy was going to sleep with Mr. Robbie." A tape of the 911 call was admitted into evidence in connection with Mr. Parms's testimony.

The police officers who arrived at the scene requested the presence of the special victims unit, which investigates sex crimes, child abuse cases, and missing persons. Detective Jonathan Medine of the special victims unit of the Baton Rouge Police Department responded to the call, testifying that the unit generally gets called for cases involving juveniles found in a parking lot without a supervised adult. Detective Stephen Woodring of the homicide division of the Baton Rouge Police Department was also called to the scene because of the blood observed in the vehicle. It was decided that Detective Woodring would be the primary investigator.

The police determined that the blue Toyota Corolla was registered to Ms. Washington, and called Brookstown Middle Magnet Academy. As a result of the telephone call, Jamicia Payne, an assistant principal at Brookstown Middle Magnet, and a friend of Ms. Washington, went to Ms. Washington's apartment. When she arrived, she saw police cars and Ms. Washington's vehicle in a parking lot on the side of the apartment complex where Ms. Washington lived. Ms. Payne advised the police that she knew Ms. Washington and D.W. The police handed D.W. to Ms. Payne. Ms. Payne testified that D.W. told her that "Mr. Robbie" had hurt her "mommy." According to Ms. Payne, D.W. referred to the defendant as "Mr. Robbie."

Ms. Payne testified that she told the police that "Mr. Robbie" was the defendant. Ms. Payne further testified that she also told the police that a couple of days earlier, Ms. Washington had forwarded to Ms. Payne text messages between Ms. Washington and the defendant about the fact that the defendant was trying to escape the responsibility of the baby. According to Ms. Payne, Ms. Washington told her that Ms. Washington and the defendant were supposed to be having a "get-

4

together to talk about the situation."

Detective Medine testified that he spoke to Ms. Payne at the scene, and she told him that the defendant and Ms. Washington were in a relationship and that Ms. Washington was pregnant with the defendant's baby. Detective Medine said that Ms. Payne also told him that Ms. Washington had made threatening statements about telling the defendant's wife that she and the defendant were in a relationship and she was pregnant, and that both Ms. Washington and the defendant worked at the same school and neither one of them showed up at school that morning. Detective Medine testified that he briefly spoke to D.W. and that she told him that "Mr. Robbie" was the one who hurt her mother. Detective Medine relayed this information to Detective Woodring.

Later that same day, Ms. Payne brought D.W. to the Children's Advocacy Center (CAC) where she was interviewed. The CAC interview was played for the jury. D.W. indicated that "Mr. Robbie" had put the blood in Ms. Washington's car. She also indicated she saw her mother get hurt. When asked who hurt her, D.W. replied, "Mr. Robbie." Toward the end of the interview, D.W. was asked if she saw "Mr. Robbie" hurt her mom. D.W. replied, "Yes ma'am."

Detective Woodring testified that upon arriving at the scene on the morning of June 9, 2016, he feared Ms. Washington was either deceased or hurt extremely bad, and the urgency at that point was to locate her. Detective Woodring retrieved a cell phone from Ms. Washington's apartment and found a number for "Robert," which he determined was the defendant's phone number.[3] According to Detective Woodring, the name Robert was important to him because D.W. had said that "Mr. Robbie" hurt her mommy.

Detective Woodring obtained a search warrant for the contents of the

_____

[3] This was an additional and/or old cell phone, as the cell phone Ms. Washington had on the evening in question was never located.

5

defendant's phone. A documentation of the web history searches from the defendant's cell phone revealed a May 20, 2016 Google search for "pregnant shot," as well as an online search for a rifle. The web history also showed a May 28, 2016, Google search for "injection of Clorox" and "What would happen if you inject bleach into your blood stream?" On May 29, 2016, a Google search was conducted for "failure to appear for paternity test," and "I missed my court date for paternity test for child support? Can they order me to pay? Child does not have my last name." The police also recovered the defendant's iPad. A forensic examination of his iPad's web history revealed a May 24, 2016 search for a large caliber handgun, and a May 28, 2016 search for whether a father had to pay child support without his name on the birth certificate.

At approximately 4:00 p.m. on June 9, 2016, the defendant was brought in for questioning. He admitted to his relationship with Ms. Washington, and told Detective Woodring that he had last seen Ms. Washington the previous night (June 8, 2016) at the Wal-Mart in Baker, Louisiana, where he talked to her, then left. The defendant said he then went to Twin Peaks Restaurant. The police reviewed hours of video footage from Twin Peaks for the night of June 8, 2016, which revealed that he never went there.

At trial, Timothy Piper was qualified as an expert in historical call data records analysis. He testified that cell phone data, which included phone records of Ms. Washington and the defendant, and historical call data collected from pinging cell phone towers in the area, revealed that on June 8, 2016, at 8:19 p.m., Ms. Washington called the defendant's cell phone from an area near the Baker Wal-Mart. The defendant was in the vicinity and received the call. The data suggested that they rode together in Ms. Washington's car to the Scotlandville area in Baton Rouge. From there, they traveled west across the Mississippi River on the Old Mississippi River Bridge and into Iberville Parish to the Ramah area. Both phones then travelled

6

back towards Baton Rouge. Ms. Washington's cell phone registered for the last time in the area of the LSU lakes. The cell phone data further showed that the defendant placed a call from his cell phone at 11:35 p.m. in the Newcastle, Sherwood Forest area.

Tramica Jackson testified at the trial. According to Ms. Jackson, in June of 2016, she and the defendant were in an intimate relationship. Ms. Jackson testified that on the morning of June 8, 2016, she and the defendant made plans for Ms. Jackson to pick up the defendant later that night "from hanging out with his friends." According to Ms. Jackson, she received a call from the defendant around 11:30 p.m. and picked him up on Newcastle Avenue near the intersection of Sherwood Forest Boulevard. According to Ms. Jackson, the defendant "had his motorcycle gear on," which she testified was a dark leather jacket, jeans, boots, gloves, and a helmet. Ms. Jackson dropped off the defendant at his motorcycle, which was located across the street from the Baker Wal-Mart.

Video footage from a Hancock Whitney bank located off of Newcastle and Sherwood was introduced into evidence and showed Ms. Jackson picking up the defendant, who was walking on Newcastle, at 11:37 p.m. on June 8, 2016.

The defendant was arrested on June 10, 2016. While he was in jail, he called his sister and asked her to erase his iPad and Apple watch.

On June 14, 2016, the deceased body of a pregnant female was found in a drainage ditch at the edge of a sugarcane field off of Rosedale Road in Grosse Tete, Louisiana, in the area where the cell phone data indicated that the defendant's and Ms. Washington's phones had travelled on the night of June 8, 2016. The body was identified as that of Ms. Washington. The coroner, Dr. William "Beau" Clark determined that the cause of death was a gunshot wound to the head. Dr. Clark testified that the baby died because it was still in utero when Ms. Washington was killed. The State and the defendant stipulated that if Zac Shawhan, an expert in DNA

analysis, was called to testify, he would be qualified as an expert in the filed of DNA analysis and would testify as to the identification of Ms. Washington and confirm that the defendant was the father of the unborn child. The parties also stipulated that if Mindy Stewart was called to testify, she would testify that she is an expert in blood splatter, that she reviewed the inside of Ms. Washington's vehicle, and that in her expert opinion the gun was not fired inside the vehicle.

The defendant did not testify at trial.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, the defendant argues the trial court erred in denying his motion for a continuance, which resulted in the denial of effective assistance of counsel.

A true bill was returned on December 8, 2020, and on this date, the defendant was represented by defense counsel Lionel Burns. At a status hearing on May 24, 2021, the State sought to set the matter for trial on June 17, 2021, or August 9, 2021, at the latest. Mr. Burns moved to continue the trial from June 21, 2021, arguing that he needed additional time to prepare, and the trial court set the matter for trial on December 13, 2021.

On the first day of trial, December 13, 2021, Mr. Burns moved for a continuance. Mr. Burns argued that his home was damaged by Hurricane Ida, and because he used his home as a home office, his ability to prepare for the case and to be as effective as he would like in the presentation of his defense of the defendant was affected. In denying the motion, the trial court stated in pertinent part:

> The court will take judicial notice of when Hurricane Ida occurred ...
> which would have been late August. So we're here today -- and today
> is December the 13th -- and prior to today, no mention has ever been
> made by counsel, either to this court or to opposing counsel, about your
> difficulties from Ida. We're only learning this on the day of trial which
> this court finds to be untimely.
>
> And I think as is mentioned, this case has been going on for quite
> some time. This court gave counsel a continuance when he initially

8

asked for it to try this case, and counsel said he'd be ready in December to try this case. To come in today at this last moment wanting to continue this trial, the court finds disingenuous at best. And we have the jury here, we also have the witnesses here, so we're going forward with the trial.

Louisiana Code of Criminal Procedure article 707 provides:

A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial.

Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice.

The trial court has much discretion in deciding to grant or deny a motion for a continuance, and a reviewing court will not disturb such a determination absent a clear abuse of that discretion and a specific showing of prejudice caused by the denial. *State v. Strickland*, 94-0025 (La. 11/1/96), 683 So.2d 218, 229; see La. Code Crim. P. art. 712.

Notwithstanding Mr. Burns' failure to file his motion to continue seven days prior to trial, his request for a continuance was based upon a lack of preparedness. The denial of a motion for continuance, wherein such motion is based on the grounds of counsel's lack of preparedness, does not warrant reversal unless counsel demonstrates specific prejudice resulting from the denial or unless the preparation time is so minimal as to call into question the basic fairness of the proceeding. See *State v. Stevenson*, 2016-0277 (La. App. 1st Cir. 9/16/16), 2016 WL 4942436, *7-8 (unpublished), writ denied, 2016-1806 (La. 9/6/17), 224 So.3d 982.

The defendant has not demonstrated any specific prejudice resulting from the denial of the motion to continue. The record reflects that Mr. Burns had been counsel for over a year on this case prior to trial. Moreover, the trial court granted Mr. Burns' first motion to continue and gave him an additional seven months to prepare for trial. Mr. Burns did not raise an issue as to his inability to prepare for this case because of

9

the damage to his home in Hurricane Ida between late August 2021, and the date of the trial, December 13, 2021. Accordingly, we find the trial court did not err or abuse its discretion in denying this motion.

With regard to the defendant's contention that Mr. Burns' lack of preparedness resulted in the denial of effective assistance of counsel, we note that issues related to counsel's preparation cannot be reviewed on appeal, but are more properly raised by an application for post-conviction relief in the trial court, where a full evidentiary hearing may be conducted. See Stevenson, 2016 WL 4942436, *8.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, the defendant argues the trial court erred in allowing the State to make inflammatory and prejudicial statements, improper legal arguments, and ad-hominem attacks against him and defense counsel in its opening statement and closing argument. He contends reversal of his conviction is warranted because such attacks on him pervaded the trial, thereby prejudicing his due process rights.

The defendant specifically notes that the State opened its case by referring to the defendant as "vile" and referring to him as "doctor of deception, doctor of a coverup," and "doctor of death." The defendant claims that the State attacked defense counsel as an outsider and attempted to inflame the passions of the jury by stating that "a gumbo of justice from [Iberville Parish] should be served ice cold, just like the ice-cold water that runs through [the defendant's] veins." The defendant further complains that in its opening statement, the State shifted the burden of proof to the defendant by arguing that it was "on [the defendant]" to show what happened to the victim's missing cell phone. The defendant contends the State improperly commented on the national attention paid to the case, telling the jury that the defendant's wife was on Nancy Grace and was "a good lady married to a bad man."

10

The defendant also complains the State made improper comments in its closing argument. The defendant specifically points to the State's comments that justice needed to be served "Iberville style;" and that the defendant was "a diabolical, manipulative master of deception who became a doctor of death." Finally, the defendant contends the State made a plea to the sympathies and passions of the jury, asking them to consider that D.W. had lived through several Christmases, Thanksgivings, and Easters without her mother and her baby sister. This was the only comment objected to by the defendant; his objection to the State's appeal to sympathy was overruled.

At the outset, we note that the jurisprudence shows that prosecutors are afforded broad latitude in choosing opening statement and closing argument and trial tactics. *State v. Howard*, 2018-0317 (La. App. 1st Cir. 9/21/18), 258 So.3d 66, 84, writ denied, 2018-1650 (La. 5/6/19), 269 So.3d 692. The trial judge has broad discretion in controlling the scope of opening and closing arguments, and this court will not reverse a conviction on the basis of improper closing argument unless thoroughly convinced that the remarks influenced the jury and contributed to the verdict. *Id.* at 84-85.

Moreover, although we do not find any of the statements made by the State in its opening and closing arguments to be so inflammatory as to have contributed to the jury's verdict, we need not reach this issue for any statements other than the defendant's claim with regard to the State's appeal to sympathy. Under La. Code Crim. P. art. 841(A), an "irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." See *State v. Johnson*, 2000-0680 (La. App. 1st Cir. 12/22/00), 775 So.2d 670, 680, writ denied, 2002-1368 (La. 5/30/03), 845 So.2d 1066. The contemporaneous objection rule provides the trial court notice and the opportunity to cure an alleged irregularity or error, and prevents a party from gambling for a favorable outcome then appealing when the error could have been

11

addressed by an objection. *State v. Lanclos*, 2007-0082 (La. 4/8/08), 980 So.2d 643, 648. The failure to make a contemporaneous objection prior to verdict waives the alleged error or irregularity and precludes the defendant from raising it on appeal.[4]

We find the defendant's argument that the State's appeal to the sympathy of the jury by asking them to consider that D.W. had lived through several holidays without her mother and her baby sister prejudiced his due process rights to be unpersuasive in light of the broad latitude afforded closing arguments. Moreover, given the evidence submitted in this case, we do not find that this remark influenced the jury and contributed to the verdicts. See *State v. Taylor*, 93-2201 (La. 2/28/96), 669 So.2d 364, 375-76, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, the defendant argues the trial court erred in allowing the State to introduce improper hearsay evidence that went directly to the issue of guilt. The defendant contends the improper admission was fatally prejudicial to him, thereby warranting a new trial.

The defendant first argues that certain testimony from Detective Medine regarding his investigation at the scene of the parking lot where D.W. was wandering around constituted inadmissible hearsay. The defendant complains of the following testimony:

> [Jamicia Payne] told [Detective Medine] that [the defendant] and Ms. Washington were in a relationship and that Ms. Washington was

---

[4] If an alleged error is so significant that it violates a fundamental right, then, to preserve the requirements of due process, the error is reviewable on appeal even absent a contemporaneous objection. See La. Code Crim. Pro. art. 920(2); *State v. Arvie*, 505 So.2d 44, 47 (La. 1987); *State v. Thompkins*, 2018-1032 (La. App. 1st Cir. 2/27/19), 273 So. 3d 346, 350 n.4, writ denied, 2019-00666 (La. 9/17/19), 278 So.3d 973. To meet the exception to the contemporaneous objection requirement, the error must cast substantial doubt on the reliability of the fact-finding process. *Thompkins*, 273 So.3d at 350 n.4. That standard is not met here.

pregnant with [the defendant's] baby. She said that Ms. Washington had made threatening statements about telling his wife that she was pregnant and that they were in a relationship, and that they both worked at the same school and that neither one of them showed up to school that morning.

The defendant further complains of Detective Medine's testimony that D.W. told him that "Mr. Robbie [was] the one who hurt her mom, and ... her mom was in ... a lake," and "her mommy had a baby in her tummy." The defendant also complains of Detective Medine's testimony that on the evening of June 9, 2016, while he was waiting with D.W. and her guardian for the forensic interviewer to arrive at the CAC, D.W. "pointed at one of the road construction signs, and she said that her mommy was near one of those signs," and that "she heard a loud bang and she remembers seeing her mommy shaking."

According to the defendant, the State introduced the same hearsay testimony through Detective Woodring.

Louisiana Code of Evidence article 801 defines hearsay as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted therein. The improper introduction of hearsay evidence will be considered harmless error if it is determined the hearsay evidence was cumulative and corroborative of other properly admitted evidence and did not contribute to the verdict. *State v. Dantin*, 2019-0407 (La. App. 1st Cir. 12/17/19), 291 So.3d 1096, 1102.

The defendant failed to lodge a contemporaneous objection during trial to the above testimony and is therefore precluded from raising the issue on appeal. *Howard*, 258 So.3d at 79-80.

Moreover, the above complained-of testimony consisted of information relayed to Detectives Medine and Woodring during their investigations. Such testimonial evidence by a police officer is admissible to explain the sequence of events leading to the defendant's arrest when there is no indication the evidence is

presented to prejudice the defendant. *Dantin*, 291 So.3d at 1103, citing *State v. Mitchell*, 2016-0834 (La. App. 1st Cir. 9/21/17), 231 So.3d 710, 726, writ denied, 2017-1890 (La. 8/31/18), 251 So.3d 410. Here, the testimony was offered to explain how the course of the investigation led officers to the defendant, and there is no indication that it was presented to prejudice him. Therefore, the testimony was arguably not hearsay. See *Dantin*, 291 So.3d at 1103.

The defendant next complains that the State introduced hearsay through Ms. Payne, including hearsay testimony of D.W. and unauthenticated text messages between Ms. Washington and the defendant. The defendant argues Ms. Payne's testimony regarding the text messages was offered to confirm the parties' relationship and the defendant's knowledge of the pregnancy, and should have been excluded as hearsay.

The defendant did not object at trial to any of this testimony on hearsay grounds. The defendant objected to Ms. Payne's testimony regarding the text messages on the basis that the texts had not been properly authenticated. The trial court overruled the objection, finding that Ms. Payne was able to identify the text messages that Ms. Washington had sent her.

It is well-settled that defense counsel must state the basis for his objection when making it and point out the specific error of the trial court. *State v. Duhon*, 2018-0593 (La. App. 1st Cir. 12/28/18), 270 So.3d 597, 631, writ denied, 2019-0124 (La. 5/28/19), 273 So.3d 315. A defendant is limited on appeal to grounds for an objection articulated at trial. A new basis for objection cannot be raised for the first time on appeal. *Id.* Herein, the defendant objected to Ms. Payne's testimony solely on the basis of improper authentication. He is raising an issue as to hearsay for the first time on appeal. Thus, the defendant is procedurally barred from objecting to Ms. Payne's testimony as hearsay.

Finally, the defendant avers that the State impermissibly introduced numerous

14

affidavits in support of search warrants with the accompanying warrants, the coroner's report, and the 911 call from Mr. Parms. According to the defendant, these documents directly allege his guilt of the charged offenses and thus their admission was exceedingly prejudicial and improper.

The defendant did not object at trial to the admission into evidence of any of these documents. With regard to the search warrants and accompanying affidavits, defense counsel offered a stipulation "that all search warrants were properly done and that the State can introduce them, either *in globo* or individually number them and introduce them." When the coroner's report and the 911 tape were offered into evidence, defense counsel stated it had no objection.

Since the defendant failed to lodge a contemporaneous objection to the admissibility of this evidence, he is precluded from raising this issue on appeal. *Howard*, 258 So.3d at 81.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 4

In his fourth assignment of error, the defendant argues the trial court erred in admitting the CAC interview, and the prejudice resulting from its admission was sufficiently severe to warrant reversal of his conviction.

A statement made by a minor victim to certain qualified persons may be recorded and introduced into evidence pursuant to La. R.S. 15:440.1 through 15:440.5. *State v. Barton*, 2020-274 (La. App. 3rd Cir. 5/5/21), 319 So.3d 907, 916, writs denied, 2021-00788, 2021-00783 (La. 10/12/21), 325 So.3d 1071, 1072.

Louisiana Revised Statutes 15:440.4(A) provides:

A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:

(1) That such electronic recording was voluntarily made by the protected person.

15

(2) That no relative of the protected person was present in the room where the recording was made.

(3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.

(4) That the recording is accurate, has not been altered, and reflects what the protected person said.

(5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a medical psychologist, a licensed professional counselor, or an authorized representative of the Department of Children and Family Services.

Louisiana Revised Statutes 15:440.5 provides in pertinent part:

A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:

(1) No attorney for either party was present when the statement was made;

(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;

(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;

(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;

(5) Every voice on the recording is identified;

(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;

(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) The protected person is available to testify.

The defendant argues that because the State failed to lay the proper foundation and otherwise establish that the video-recorded interview of D.W. at the CAC complied with the statutory requirements, the video was not properly admitted. The defendant does not dispute that the following requirements of La. R.S. 15:440.4 and 15:440.5 were complied with: no attorney or relative was present when D.W. was

16

interviewed; the CAC tape had not been altered; the interview was taken under the supervision of Detective Medine; D.W. and April Caldwell, the forensic interviewer, were identified; and Detective Medine was present during the interview, and both he and D.W. testified at trial.

The defendant avers that the interview was not voluntarily made. According to the defendant, Ms. Caldwell did not tell D.W. that she was being recorded, nor did she make any attempt to obtain D.W.'s consent. We disagree with the defendant's assertion. The CAC tape shows that D.W. voluntarily engaged in conversation with Ms. Caldwell. In addition, on several occasions during the interview, Ms. Caldwell asked D.W. if D.W. was okay talking with Ms. Caldwell and answering her questions.

The defendant further contends the CAC interview should not have been admissible because Ms. Caldwell asked D.W. numerous leading questions. Both La. R.S. 15:440.4(A)(3) and La. R.S. 15:440.5(A)(4) prohibit questions calculated to lead the protected person to make any particular statement. The rule forbidding leading questions, however, may yield somewhat to the trial court's discretion in the examination of young victims. *State v. Roberts*, 42,417 (La. App. 2nd Cir. 9/19/07), 966 So.2d 111, 120. Furthermore, notwithstanding the general rule against leading questions, the matter is largely within the discretion of the trial court and, in the absence of palpable abuse of that discretion resulting in prejudice to the accused, a finding of reversible error is not warranted. *State v. Feazell*, 486 So.2d 327, 330 (La. App. 3rd Cir.), writ denied, 491 So.2d 20 (La. 1986).

Moreover, some leading questions may be allowed when necessary to elicit particular details for purposes of clarifying the protected person's statement. *Roberts*, 966 So.2d at 121. This was particularly true in the instant matter. Detective Medine testified that the police were trying to locate Ms. Washington, who they believed was in danger or gravely injured. Thus, Ms. Caldwell at times asked D.W.

17

leading or pointed questions to get D.W. to focus and respond accordingly. As such, despite leading questions, considering D.W.'s age and the context of the interview, and because the questions were appropriate under the circumstances, we find the trial court did not abuse its discretion in admitting the CAC interview. See *State v. Guerra*, 36,347 (La. App. 2nd Cir. 12/18/02), 834 So.2d 1206, 1217, writ denied, 2003-0072 (La. 4/25/03), 842 So.2d 398.

The defendant also avers the competency of D.W. was not properly established for the CAC interview. The defendant cites *State v. Dykes*, 440 So.2d 88, 92 (La. 1983), which found that children of three years or less are not generally competent witnesses. The defendant's reliance on *Dykes* is misplaced. *Dykes* addressed the competency issue of a young child *testifying at trial*. There is no competency requirement contained in La. R.S. 15:440.4 or La. R.S. 15:440.5. Any issues with D.W. being preoccupied or non-responsive during the CAC interview would have been a factual issue for the jury to consider in determining how credible D.W. was.

Finally, the defendant suggests the CAC video should have been excluded because the State failed to connect D.W.'s statements to the defendant. The defendant contends that D.W. was not shown any photographs or asked to identify the "Mr. Robbie" she spoke about in the CAC video. This claim is baseless. As noted, the police were in the middle of an ongoing investigation attempting to ascertain the whereabouts of Ms. Washington. To that end, Ms. Caldwell attempted to ascertain as much information as she could from D.W. Whether D.W. confirmed the identity of the defendant had no bearing on the admissibility of the CAC videotape as required under La. R.S. 15:440.4 or La. R.S. 15:440.5. It was the province of the jury as fact finder to accept or reject all or part of the CAC interview. Moreover, in the CAC interview, D.W. identified the person who hurt her mother as "Mr. Robbie." Ms. Payne, who worked with both Ms. Washington and the defendant

18

at Brookstown Middle Magnet School, testified that D.W. referred to the defendant as "Mr. Robbie."

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 5

In his fifth assignment of error, the defendant argues the trial court erred in commenting on the testimony of a witness and in allowing the State to bolster the testimony of witnesses.

The defendant contends the State's bolstering began in its opening statement, when the State denied that D.W. was coached and boasted that the jury would see good law enforcement work, and it continued through closing argument when it noted that D.W. was not coached, and that the cell phone data expert, Timothy Piper, "does only 100 percent perfection data."

The defendant further contends that the State asked questions on direct examination designed to artificially support its witnesses' testimony before any attempt by the defense to discredit the witness. The defendant complains of the State's questioning of Mr. Parms on direct examination as to whether D.W. was coached by him or by the police or if he (Mr. Parms) was coached to call 911; and on redirect, when the State thanked Mr. Parms for his military service. The defendant also complains of the State asking Detective Medine if he led D.W. to make certain responses. The defendant asserts the same error was made on the redirect examination of Ms. Payne and Ms. Williams, when questions led them to reply they had not lied or been coached.

The defendant next complains of bolstering through the testimony of Detective Woodring, who testified that the things D.W. said were corroborated by the investigation. The defendant further argues that the State impermissibly elicited testimony from Detective Woodring that expressed his opinion as to the defendant's

19

guilt.[5]

The defendant further contends that the State attempted to reveal personal connections with a witness, thereby improperly offering its own integrity as a reason to believe the witness. Finally, the defendant contends the trial court improperly influenced the jury by commenting to Detective Medine, at the conclusion of his testimony, that he "did a great job."[6]

---

[5] Following is the relevant exchange on direct examination between the State and Detective Woodring:

Q. Is Mr. Robert Marks, the defendant, the person you charged with murder in this case?
A. Yes.
Q. Okay. As a result of your investigation, is there anybody else in your mind who killed Lyntell Washington?
A. Absolutely not.
Q. Say it again.
A. Absolutely not.
Q. There's nobody on earth other than him, Robert Marks, who you feel--

At this point, defense counsel objected that the question had been asked and answered. The defendant did not object to this exchange on the basis that the questioning was designed to elicit an opinion as to the ultimate question of the defendant's guilt. See La. Code Evid. art. 704 ("in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused."). As noted above, the failure to make a contemporaneous objection waives an alleged error or irregularity and precludes the defendant from raising it on appeal because the trial court is not placed on notice of the alleged irregularity or error and given an opportunity to cure it. See Lanclos, 980 So.2d at 648. On very rare occasions, courts have refused to apply the contemporaneous objection rule as a bar to review an error which was so fundamental that it struck at the very essence of the reliability of the fact-finding process, such as incorrectly advising the jury of the elements of the crime with which was the defendant was charged, or failing to instruct the jury that prior crimes could only be considered for the purpose of sentence enhancement and not for the purpose of deciding guilt or innocence of the charged crime. See Arvie, 505 So.2d at 47-48. However, the relevancy or the prejudice of witness testimony is not one of the limited exceptions to the contemporaneous objection rule that has been recognized. See State v. Rochon, 98-717 (La. App. 5th Cir. 3/10/99), 733 So.2d 624, 628. That is because such errors could easily have been addressed and corrected by the trial court with an objection. Id.

In this case, we find the facts do not warrant an exception to the contemporaneous objection rule. The error, if any, in Detective Woodring's testimony, was not an error that was so fundamental that it strikes at the very essence of the reliability of the fact-finding process. Arvie, 505 So.2d at 47. Further, courts have declined to extend the limited exceptions to the contemporaneous objection rule to include prejudicial errors in witness testimony. See Rochon, 733 So.2d at 628; State v. Massey, 10-861 (La. App. 5th Cir. 6/14/11), 71 So.3d 367, 378, writ denied, 2011-1621 (La. 4/20/12), 85 So.3d 1259. Since the defendant in the instant case failed to object to Detective Woodring's testimony, and this is not the type of error that justifies the use of the exception to the contemporaneous objection rule, we decline to address this issue on appeal. See Massey, 71 So.3d at 378.

[6] Louisiana Code of Criminal Procedure article 772 states: "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." See also La. Code Crim. Pro. art. 806 (imposing identical prohibition regarding jury charges). Although Article 772 precludes the judge from commenting on the facts of the case in the presence of the jury, in order to constitute reversible error, improper comments

20

Because the defendant failed to contemporaneously object to any of the complained-of comments or questions on the basis that they were prohibited comments on a witness's testimony or bolstered the witness's testimony, he is procedurally barred from having this claim reviewed. See La. Code Crim. P. art. 841.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 6

In his sixth assignment of error, the defendant argues the trial court erred in allowing gruesome video and photographic evidence to be introduced because the probative value of the evidence was substantially outweighed by its grave prejudice. In particular, the defendant contends that at trial, in addition to introducing a photograph of Ms. Washington's body at the location it was discovered, the State played a video that walked the jury through the location where the body was found. The defendant further argues that the State introduced thirteen additional photographs of Ms. Washington's body taken during the autopsy, including a skeleton of the bones of the unborn fetus.

The record reflects that the defendant did not object to the introduction of the photograph of Ms. Washington's body at the location it was discovered or the crime scene video, both of which were introduced during Detective Woodring's testimony. In connection with the coroner's testimony, the State offered into evidence five photographs taken at the autopsy of Ms. Washington's body. The defendant

---

must have influenced the jury and contributed to the verdict. *State v. Brown*, 2016-0998 (La. 1/28/22), 347 So.3d 745, 815, reh'g denied, 2016-00998 (La. 3/25/22), 338 So.3d 1138, and cert. denied, No. 22-77, ___ U.S. ___, 143 S.Ct. 886, ___ L.Ed.2d ___, (2023). A trial judge's remarks constitute harmless error if those remarks do not imply an opinion as to the defendant's guilt or innocence. *Id.* at 815-16.

We note that the trial court's comment to Detective Medine was not a comment on the facts of the case or an opinion as to the defendant's guilt or innocence. Nevertheless, counsel for the defendant failed to object to the trial judge's remark and, thus, this issue was not been preserved for appellate review. See *State v. Camper*, 2008-0314 (La. App. 4 Cir. 10/1/08), 996 So.2d 571, 579. See also *State v. Ball*, 2016-653 (La. App. 3 Cir. 12/7/16), 209 So.3d 793, 819, writ denied, 2017-0045 (La. 9/22/17), 227 So.3d 825.

21

indicated he had no objection.

Because the defendant failed to lodge a contemporaneous objection to the admissibility of this evidence, he is precluded from raising this issue on appeal. *Howard*, 258 So.3d at 81.

In connection with Detective Woodring's testimony, the State sought to introduce photographs taken at the autopsy. The defendant objected, placing a "continuing objection on the record about the gruesome photos and how this is unnecessary." The defendant further objected that it was "excessive" and "repetitive." The State and defense counsel, along with the trial court, went through the photographs and removed duplicative ones. The trial court allowed the State to introduce eight photographs of the autopsy, which the State contended reflected the autopsy of Ms. Washington's body and the skeleton of the fetus. [7]

Louisiana Code of Evidence article 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible, unless prohibited by law or by the constitution. La. C.E. art. 402. Relevant evidence may be excluded if its probative value is substantially outweighed by "the danger of unfair prejudice." La. C.E. art. 403.

Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. *State v. Sepulvado*, 93-2692 (La. 4/8/96), 672 So.2d 158, 164. A trial court's ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. *State v. Magee*, 2011-0574 (La. 9/28/12), 103 So.3d 285, 323.

---

[7] The same two photographs of the skeleton of the bones of the unborn fetus were admitted in connection with both the coroner's and Detective Woodring's testimony.

Even when the cause of death is undisputed, the state is entitled to the moral force of its evidence and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as the location and placement of wounds, and to provide positive identification of the victim. *Magee*, 103 So.3d at 323. Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence. *Id.*

The eight photographs introduced in connection with Detective Woodring's testimony reflected the condition of Ms. Washington's body, the gunshot wound to her head, and the skeleton of the unborn child, from which DNA was extracted to establish the defendant was the father of the unborn child. While it is unclear from the record how many photographs the State sought to admit in connection with Detective Woodring's testimony, after consultation with both the State and defense counsel, the trial court allowed only eight photographs. The defendant showed no abuse of discretion on the part of the trial court in admitting these eight photographs. See *Magee*, 103 So.3d at 323.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 7

In his seventh assignment of error, the defendant contends the trial court erred in allowing expert testimony by a lay witness. According to the defendant, despite failing to comply with La. Code Crim. Pro. Art 719,[8] the State called Detective

---

[8] Louisiana Code of Criminal Procedure article 719(A) provides that:

Upon written motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of a physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. If the witness preparing the report will be called as an expert, the report shall contain the witness's area of expertise, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor. If the expert witness has not reduced his results to writing, or if the expert witness's written report does not contain the

23

Woodring to provide what amounted to expert testimony regarding cell phone forensics, blood splatter, DNA, and decomposition analysis, all of which should have been excluded as unnoticed and/or improper expert testimony by a lay witness.

At the outset, we note that the defendant failed to lodge contemporaneous objections during trial to any of the complained-of testimony on the basis that the State failed to comply with Article 719 or that Detective Woodring was offering improper expert testimony. Accordingly, the defendant is precluded from raising this issue on appeal. *Howard*, 258 So.3d at 79-80.

Moreover, Article 701 permits non-expert testimony in the form of opinions or inferences that are rationally based on the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. Opinion testimony has been permitted by non-expert police officers based on training, investigation, perception of the scene and observation of physical evidence. *State v. LeBlanc*, 2005-0885 (La. App. 1st Cir. 2/10/06), 928 So.2d 599, 603-04.

Detective Woodring testified that in June 2016, he had been a homicide detective with the Baton Rouge Police Department for a little over five years. At that time, he had worked more than one hundred homicide cases as either primary or secondary investigator, and had worked as the lead detective on approximately fifty homicide cases. In addition to his training with the homicide division, Detective Woodring completed a class in cellular phone and phone record data forensics. He testified that while he did not have any formal training in blood splatter analysis, he had "learned from experience." He further testified as to his experience with decomposition of a body.

---

information required of an expert as provided in this Article, the state must produce for the defendant a written summary containing any information required to be produced pursuant to this Article but absent from a written report, if any, including the name of the expert witness, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor.

24

It is apparent from the record that Detective Woodring's lay testimony was based on his training, investigation, perception of the scene and observation of physical evidence. See *LeBlanc*, 928 So.2d at 604.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 8

In his eighth assignment of error, the defendant argues that insufficient evidence was offered to convict him of the offenses of second degree kidnapping, aggravated kidnapping of a child, carjacking, obstruction of justice, and the illegal carrying of a weapon while committing the crimes of second degree kidnapping and aggravated kidnapping of a child. The defendant does not challenge the convictions for second degree murder, first degree feticide, and the convictions of the illegal carrying of a weapon while committing these crimes of violence.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); *State v. Ordodi*, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; *State v. Mussall*, 523 So.2d 1305, 1308-09 (La. 1988). The *Jackson* standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See *State v. Patorno*, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

The *Jackson* standard of review does not permit a reviewing court to substitute its own appreciation of the evidence for the fact finder's, assess the credibility of

witnesses, or reweigh evidence. *State v. McGhee*, 2015-2140 (La. 6/29/17), 223 So.3d 1136, 1137 (per curiam); *State v. Calloway*, 2007-2306 (La. 1/21/09), 1 So.3d 417, 422 (per curiam). A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310.

Second Degree Kidnapping

At the time of the offense, La. R.S. 14:44.1 provided, in relevant part, as follows:

A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:

...

(3) Physically injured or sexually abused;

...

(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.

B. For purposes of this Section, kidnapping is:

(1) The forcible seizing and carrying of any person from one place to another; or

(2) The enticing or persuading of any person to go from one place to another; or

(3) The imprisoning or forcible secreting of any person.

The evidence in the present case, when viewed in the light most favorable to the prosecution, showed that on the evening of June 8, 2016, Ms. Washington met the defendant in an area near the Baker Wal-Mart. The evidence further showed that the defendant's and Ms. Washington's cell phones traveled along the same route to the location where Ms. Washington's body was later found with a gunshot to her head. The evidence established that Ms. Washington's blue Toyota Corolla was located in a parking lot near her apartment on Newcastle Avenue. Video footage from the Hancock Whitney bank as well as Ms. Jackson's testimony showed that Ms. Jackson picked up the defendant around 11:30 p.m. on Newcastle Avenue near

26

the location of Ms. Washington's apartment. Ms. Jackson testified that around midnight on the night of June 8, 2016, she dropped the defendant off at his motorcycle in the parking lot of the Baker Wal-Mart. Ms. Payne testified that prior to June 8, 2016, Ms. Washington told her that Ms. Washington and the defendant were planning to get together "to talk about the situation," of Ms. Washington's pregnancy.

A rational juror could have concluded that on the evening of June 8, 2016, the defendant arrived in the area of the Baker Wal-Mart on his motorcycle, and Ms. Washington arrived in her vehicle. A rational juror could have further concluded that the defendant persuaded Ms. Washington to travel with him in her vehicle from the Baker Wal-Mart into Iberville Parish to the Ramah area under the guise of working on their relationship. A rational juror could have alternatively concluded that once he met Ms. Washington in the area of the Baker Wal-Mart, the defendant forcibly seized her and brought her from Baker to Ramah. Considering that Ms. Washington was killed by a gunshot to her head, a rational juror could have concluded that the defendant was armed with a gun, which he used to shoot her.

We find that that the circumstantial evidence was sufficient to establish that the defendant either enticed or forcibly carried Ms. Washington from Baker to the Ramah area where he shot her. Accordingly, we find there is sufficient evidence to uphold the defendant's conviction for second degree kidnapping.

Aggravated Kidnapping of a Child

Under La. R.S. 14:44.2(A), aggravated kidnapping of a child is the unauthorized taking, enticing, or decoying away and removing from a location for an unlawful purpose by any person other than a parent, grandparent, or legal guardian of a child under the age of thirteen years with the intent to secret the child from his parent or legal guardian.

The evidence in the present case established that D.W. was found on the

27

morning of June 9, 2016, in a parking lot near the apartment where she lived without any adult supervision. As noted above, video footage from the Hancock Whitney bank as well as Ms. Jackson's testimony established that Ms. Jackson picked up the defendant around 11:30 p.m. on the evening of June 8, 2016, near that location. Ms. Payne testified that D.W. told Ms. Payne that the defendant had hurt D.W.'s "mommy." Ms. Payne further testified that the police allowed Ms. Payne to take temporary custody of D.W. because Ms. Payne knew D.W. At trial, Ms. Washington's twin sister, Cyntell Washington, testified that she was living in Austin, Texas, when Ms. Washington went missing. Cyntell Washington testified that she travelled to Baton Rouge, Louisiana, and was granted temporary custody of D.W. until early November 2016, when D.W.'s biological father obtained custody.

A rational juror could have concluded that D.W. was in Ms. Washington's car when the defendant met Ms. Washington near the Baker Wal-Mart, traveled to the Ramah area, returned to Baton Rouge, and abandoned Ms. Washington's car in a parking lot near her apartment. A rational juror could have concluded that the defendant knew D.W. was in the vehicle with her mother, and took the vehicle, with D.W. inside, for the unlawful purpose of killing Ms. Washington. A rational juror could have further concluded that rather than deliver D.W. to a safe location (like a police or fire station) where she could be returned to a legal guardian, the defendant abandoned D.W. in a parking lot, where she remained overnight, in order to secrete the child so that he would not be implicated in Ms. Washington's murder.

We find that that the circumstantial evidence, when viewed in the light most favorable to the prosecution, is sufficient to uphold the defendant's conviction for aggravated kidnapping of a child.

Carjacking

Under La. R.S. 14:64.2(A), carjacking is the intentional taking of a motor vehicle belonging to another person, in the presence of that person, or in the presence

28

of a passenger, by the use of force or intimidation.

The evidence in the present case, when viewed in the light most favorable to the prosecution, showed that on the evening of June 8, 2016, Ms. Washington was shot and her body was left in the Ramah area. Video footage from the Hancock Whitney bank, as well as Ms. Jackson's testimony, established that Ms. Jackson picked up the defendant around 11:30 p.m. on Newcastle Avenue near the location of Ms. Washington's apartment. The evidence further established that on the morning of June 9, 2016, D.W., along with Ms. Washington's vehicle, were located in a parking lot near Ms. Washington's apartment on Newcastle Avenue.

A rational juror could have concluded that on the evening of June 8, 2016, the defendant shot Ms. Washington and took her vehicle, with D.W. inside, and drove back to Baton Rouge.

We find that that the circumstantial evidence was sufficient to establish that the defendant took Ms. Washington's vehicle, in her presence, and in the presence of a passenger, by the use of force. Accordingly, we find there is sufficient evidence to uphold the defendant's conviction for carjacking.

Obstruction of Justice

At the time of the offense, La. R.S. 14:130.1 provided, in relevant part, as follows:

> A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
>
> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers[.]

29

The evidence in the present case established that searches had been made from the defendant's cell phone and iPad for information about purchasing a gun, and a father's liability for child support. The evidence also established that when the defendant was in jail, he called his sister and spoke to her about erasing his iPad. Finally, the evidence established that Ms. Washington died of a gunshot wound to the head and that the murder weapon was never located. Detective Woodring testified that the police investigated the area near the LSU lakes where Ms. Washington's cell phone last registered, but were unable to locate the murder weapon or her cell phone.

A rational juror could have concluded that the defendant possessed the specific intent to distort the results of the investigation by asking his sister to remove evidence of searches he made on his iPad. A rational juror could have also concluded that the defendant disposed of the murder weapon and Ms. Washington's cell phone with the intent to avoid detection as the shooter. See *Dorsey*, 312 So.3d at 665.

Accordingly, we find the evidence sufficient to uphold the defendant's conviction for obstruction of justice.

Illegal Possession of a Weapon While Committing a Crime of Violence

It is unlawful for an offender to use, possesses, or have under his immediate control a firearm, while committing or attempting to commit a crime of violence. La. R.S. 14:95(E). Louisiana Revised Statutes 14:2 (B) defines a "crime of violence" as an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon.

Defendant's argument herein is limited to only those counts related to the defendant's convictions for second degree kidnapping and aggravated kidnapping of

30

a child. We have found that there is sufficient evidence to uphold these convictions. Because the evidence indicated that Ms. Washington was shot with a firearm, a rational juror could have concluded that the defendant used, possessed, or had under his immediate control a firearm, while committing the offenses of second degree murder and aggravated kidnapping of a child.

Accordingly, we find there is sufficient evidence to uphold the defendant's convictions for these charges.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 9

In his ninth assignment of error, the defendant argues he was denied the right to effective assistance of counsel in violation of his due process rights. He complains of the following non-exhaustive list of alleged deficiencies:

(1) Counsel failed to file any substantive motions until the morning of trial, including no requests to suppress evidence, statements or identifications, all of which were at issue in this case;

(2) Counsel failed to meaningfully object to inadmissible hearsay testimony and other errors made by the State at trial (which are now being raised for the first time in this appeal);

(3) Counsel failed to meaningfully cross-examine the State's witnesses at trial;

(4) Counsel failed to prepare a defense;

(5) Counsel failed to consult an expert or otherwise challenge scientific evidence;

(6) Counsel failed to give a closing argument at trial.

A claim of ineffective assistance of counsel is more properly raised by an application for post-conviction relief in the trial court, where a full evidentiary hearing may be conducted. *State v. McKinney*, 2015-1503 (La. App. 1st Cir. 4/25/16), 194 So.3d 699, 708, writ denied, 2016-0992 (La. 5/12/17), 220 So.3d 747. However, where the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel when raised by assignment of error on appeal, it

31

may be addressed in the interest of judicial economy. *Id.* See *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Because the defendant's claims raise issues related to his counsel's preparation, investigation, and strategy, these claims cannot be reviewed on appeal. *McKinney*, 194 So.3d at 708. Only in an evidentiary hearing in the district court, where the defendant could present evidence beyond what is contained in the instant record, could these allegations be sufficiently investigated.[9]

Accordingly, these allegations are not subject to appellate review.

This assignment of error is unreviewable on appeal.

## ASSIGNMENT OF ERROR NO. 10

In his tenth assignment of error, the defendant argues he was denied his fundamental right to testify in his own defense.

According to the defendant, there is no evidence he was even present in the courtroom when the State and defense counsel rested. Also, the defendant avers there was no confirmation obtained as to his right to testify or a knowing waiver of that right.

A minute entry of the last day of trial indicates the defendant was present when the State and defense counsel rested. Moreover, the defendant's silence created the presumption he voluntarily waived his right to testify, and the defendant has made no showing otherwise. There is nothing in the record before us to indicate that the defendant unequivocally made known his desire to testify but was somehow denied. Cf. *State v. Hampton*, 2000-0522 (La. 3/22/02), 818 So.2d 720, 729-30.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 11

In his eleventh assignment of error, the defendant argues the trial court erred

---

[9] The defendant would have to satisfy the requirements of La. Code Crim. P. art. 924, *et seq.*, in order to receive such a hearing.

in denying his motion to quash, as venue was not proper in Iberville Parish.

Louisiana Code of Criminal Procedure article 611 governs the jurisdiction and venue of criminal trials. At the time of the offense, Article 611 provided, in pertinent part:

> A. All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.

> B. If the offender is charged with the crime of first or second degree murder and it cannot be determined where the offense or the elements of the offense occurred, the offense is deemed to have been committed in the parish where the body of the victim was found.

Critically, venue is a factual question and, on appeal, review is limited to whether the State submitted some evidence of proper venue. As such, review of the issue on appeal is not concerned with weighing the sufficiency of the evidence presented by the State. Finally, a trial court's ruling on a motion to quash is discretionary and should not be reversed absent a clear abuse of discretion. *State v. Eason*, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 72.

In this case, Ms. Washington's body was found in Iberville Parish. The State presented evidence, through the testimony of Detective Woodring, that he was never able to determine where Ms. Washington was murdered. Accordingly, pursuant to Article 611, the offense is deemed to have been committed in the parish where the body of the victim was found, and venue is proper in that parish. See also *State v. Gross*, 2018-1014 (La. App. 1st Cir. 2/25/19), 273 So.3d 317, 320, writ denied, 2019-00498 (La. 9/17/19), 278 So.3d 972 (Where a body is found, and it is unknown where the actual killing took place, proper venue is in the parish where the body of the victim was discovered.).

The trial court did not abuse its discretion in denying the defendant's motion to quash.

33

This assignment of error is without merit.

## REVIEW FOR ERROR

Initially, we note that our review for error is pursuant to La. Code Crim. P. art. 920, which provides that the only matters to be considered on appeal are errors designated in the assignments of error and "error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

Any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435 (2000); *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224 n. 6, 143 L.Ed.2d 311 (1999). Additional elements of an offense must be charged in the indictment, submitted to a jury, and proven by the government beyond a reasonable doubt. *Jones*, 526 U.S. at 232, 119 S.Ct. at 1219. The statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. *Blakely v. Washington*, 542 U.S. 296, 303, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004); *State v. Hines*, 2010-1118 (La. App. 1st Cir. 12/22/10), 52 So.3d 1120, 1126.

The record reflects that on the charge of aggravated kidnapping of a child, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

The sentencing provisions of La. R.S. 14:44.2 at the time of the offense provided as follows:

> B. (1) Whoever commits the crime of aggravated kidnapping of a child shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
>
> (2) Notwithstanding the provisions of Paragraph (1) of this Subsection, if the child is returned not physically injured or sexually abused, then the offender shall be punished in accordance with the provisions of R.S.

34

14:44.1.

Louisiana Revised Statutes 14:44.1, second degree kidnapping, provides that "[w]hoever commits the crime of second degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence."

The bill of indictment charged the defendant with aggravated kidnapping of a child pursuant to the provisions of La. R.S. 14:44.2 (A) & (B) (2).[10] However, it is apparent he was sentenced under the provisions of La. R.S. 14:44.2 (B) (1). The enhanced provisions of La. R.S. 14:44.2 (B) (1), requiring that the child be physically injured or sexually abused, were not submitted to the jury, and the jury made no finding of whether D.W. was physically injured or sexually abused. Accordingly, we find that the trial court erred in sentencing the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence under the provisions of La. R.S. 14:44.2 (B) (1), vacate the sentence and remand for resentencing on this charge.

**CONVICTIONS AFFIRMED; SENTENCE IMPOSED FOR COUNT 9, AGGRAVATED KIDNAPPING OF A CHILD, VACATED; ALL OTHER SENTENCES AFFIRMED; REMANDED FOR RESENTENCING ON COUNT 9.**

---

[10] The bill of indictment erroneously charged the defendant under La. R.S. 14:44, aggravated kidnapping, rather than La. R.S. 14:44.2, aggravated kidnapping of a child. However, the defendant was not misled by the erroneous citation and the fact that he was charged under the wrong statute is not grounds for reversal of his conviction. *State v. Johnson*, 404 So.2d 239, 242 (La. 1981).

35